**SCHARLACH v. PACIFIC MUT. LIFE INS. CO.**

(Circuit Court of Appeals, Fifth Circuit. November 29, 1926.)

No. 4888.

I. Insurance ⊜⟶668(7)—Evidence in action on life policies held to warrant direction of verdict for defendant, on ground that insured was not in good health when policies were delivered.

Under provisions of life policies that they should not take effect unless insured was in good health when they were delivered, where he died 2½ months after their delivery, after removal of a large cancer of the stomach, testimony of two physicians, who separately examined him and made blood tests prior to the time of such delivery, that he was then suffering from severe secondary anæmia, and that in their opinion he was not in good health, *held* to warrant direction of verdict for defendant in an action on the policies.

**2. Insurance ☞665(3)—Cancer, disclosed by operation on insured, may be evidence of its existence for considerable, though indefinite, time.**

A cancer, disclosed by an operation on insured, may not be evidence sufficient to support a finding as to how long it had existed, yet be conclusive proof that it had been in existence several months.

**3. Evidence ☞571(1)—Testimony of physicians of disease, based on examination, held not rebutted by testimony based only on appearance.**

Where a disease is one the existence of which at a given stage of it is not discoverable, even by a skilled physician, except by ascertaining existing symptoms and making examination of the blood of the person in question, a finding by a physician, based on such an examination, that the person has such disease, is not put in issue or impeached by a finding of the absence of disease by another physician, who made no such examination, and from whom the symptoms suggesting it were concealed, nor by testimony, based only on observation of such person's outward appearance, that he then seemed to be in good health.

In Error to the District Court of the United States for the Western District of Texas; Duval West, Judge.

Action at law by Mrs. Mary Scharlach against the Pacific Mutual Life Insurance Company. Judgment for defendant, and plaintiff brings error. Affirmed.

See, also, 9 F.(2d) 317.

J. D. Wheeler, of San Antonio, Tex. (R. J. Boyle, Hill Grover, J. D. Wheeler, and Boyle, Ezell & Grover, all of San Antonio, Tex., on the brief), for plaintiff in error.

John H. Cunningham and A. N. Moursund, both of San Antonio, Tex. (John C. Wall and Cunningham & Moursund, all of San Antonio, Tex., on the brief), for defendant in error.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. This was an action on two policies of insurance alleged to have been issued on the life of Meyer Scharlach, and which were delivered to him on May 12, 1923. Each of the policies contained the provision that there shall be no liability under it until it shall be manually delivered to the applicant during his lifetime and good health. The claims asserted were resisted on the grounds: (1) That the deceased was not in good health when the policies were delivered to him; and (2) that the policies were issued in reliance on the truth of specified statements in deceased's application therefor, which statements were ma-

terial to the risk, were known by the deceased to be false, and were made by him willfully and with intent to defraud the insurance company.

When the case was here on a former writ of error, it was decided that, upon the plaintiff making out a prima facie case by proof that the policies were delivered to the deceased and were in his possession at the time of his death, the burden was on the insurance company to prove that the deceased was not in good health when the policies were delivered. Scharlach v. Pacific Mut. Life Ins. Co. (C. C. A.) 9 F.(2d) 317. Upon the conclusion of the evidence the court instructed the jury to bring in a verdict in favor of the insurance company. Remarks which accompanied this action of the court showed that it was a result of the conclusion that the evidence showed that Scharlach was not in good health when the policies were delivered. The judgment presented for review was rendered pursuant to the verdict which the court directed.

[1] Uncontroverted evidence showed the following:

The deceased, who lived in San Antonio, on March 15 or 16, 1923, called on a practicing physician of that city, Dr. Manhoff, and complained of dizziness. On that occasion Dr. Manhoff did not discover from deceased's appearance that he had any disease, gave him no treatment, and "turned him loose with advice to take care of his eyes, and as to the movement of his bowels." On April 5, 1923, deceased came to Dr. Manhoff again, stating that his dizziness became worse, and that when he made any effort like climbing stairs he had shortness of breath. Dr. Manhoff then made an examination into deceased's condition, found that his red blood cells were low in number, being about half what they should be, and that he was suffering from severe secondary anæmia, directed him to be examined by specialists, treated him actively for a period of about two or three weeks, and then, as stated by Dr. Manhoff, "after the end of April and early in May—May 12th—I got signs of definite failing of the heart, and he wanted to go elsewhere for treatment, Cincinnati, I believe. * * * He did not remain in San Antonio and continue to take treatment from me after May 12th."

On April 12, 1923, deceased consulted another San Antonio physician, Dr. Sigmund Burg, whose son, Dr. Edward M. Burg, then made a blood count of deceased's blood, which count showed that deceased was "suffering from anæmia to a marked degree." On April 30, 1923, deceased went to Alten-

heim, the Hermann Sons' Home, near Comfort, Tex., "because," as stated by deceased's widow, the plaintiff in the suit, "Dr. Manhoff told him he was in a run-down condition, and he thought a trip to Comfort would do him a lot of good." Soon after May 12th, deceased went to Cincinnati to be examined. He then went to New York and was examined there. From New York he went to Mayo Bros. at Rochester, Minn. He arrived at Mayo Clinic for examination July 9, 1923, was operated on there by Dr. Judd on July 14, 1923, and died on July 26, 1923. The examination at the Mayo Clinic showed that he had cancer of the stomach and secondary anæmia. The operation disclosed an ulcer which was "about three inches in diameter, with a large crater." In the operation about two-thirds of the stomach was removed.

Dr. Manhoff testified: "At the time he came to me on April 5, 1923, * * * he was not in good health. * * * My diagnosis of his condition, on or about May 12th, was severe secondary anæmia, almost pernicious anæmia; that condition indicates that a man's blood is poor and cannot nourish the system, and that unless the condition is corrected he will die. My opinion is that he was a very sick man at that time. * * * In my opinion as a physician, Mr. Scharlach was not in good health at any time between the 16th day of March and the 12th of May, 1923. * * * If Mr. Scharlach died in July of cancer of the stomach, I would believe that would be the cause of his anæmia; that it was connected with his anæmia." In answer to questions which hypothesized the history of the deceased's case as shown by the testimony, including a description of the cancer disclosed by the operation, several physicians, whose competence as experts was not questioned, testified to the effect that that cancer must have been in existence prior to May 12, 1923, and that the disease was progressive.

The following was relied on as evidence rebutting the above indicated proof that the deceased was not in good health when the policies were delivered to him:

Dr. Judd, who performed the operation on the deceased, and who testified by deposition, in answer to the question, "In your judgment as a physician, how long had Scharlach been suffering from the disease which you found when you operated on him?" stated, "No way of telling." Dr. Beal, the insurance company's medical examiner at San Antonio, examined the deceased on March 29, 1923, and did not discover that he had any disease. Dr. Beal testified that he

had no information, other than from his observations at the time and that given in the deceased's answers to written questions asked him; that he did not make any blood count, and that there was nothing in the examination to indicate the necessity for a blood count. The deceased answered "No" to questions asking if he had ever had or been treated for dizziness, or shortness of breath, and what treatments by or consultations with physicians or practitioners he had had during the last seven years.

The widow of the deceased testified that deceased, during the first part of 1923, "didn't complain to me about his health; he looked well; he was always pale; I could not say I believed he was any worse than any other time; he always had a very pale complexion; yes, it was sort of sallow complexion." Several acquaintances of the deceased, who saw and had dealings with him during the time Dr. Manhoff was treating him, testified to the effect that his health at that time seemed to be all right; that his appearance did not indicate any change in his health.

It is not claimed that the policies took effect, if in fact the deceased was not in good health at the time they were delivered to him. Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, 14 S. Ct. 379, 38 L. Ed. 231; New York Life Insurance Co. v. Wertheimer (D. C.) 272 F. 731.

[2] To say the least, it is questionable whether there was the slightest inconsistency between the evidence to the effect that the deceased was not in good health when the policies were delivered and the evidence relied on by the plaintiff in error. Dr. Judd's statement that there was no way of telling how long the deceased had been suffering from cancer was consistent with the truth of the testimony to the effect that the ulcer disclosed by the operation proved that the cancer had been in existence since prior to May 12, 1923. A cancer disclosed by an operation may not be evidence sufficient to support a finding as to how long it had existed, and at the same time be conclusive proof that it had been in existence several months. There was no material conflict between the other testimony relied on by the plaintiff in error and that to the effect that deceased was not in good health on May 12th, when the policies were delivered. The testimony of the physicians who treated the deceased or examined his blood prior to that date indicated that the deceased then had no serious ailment, which was disclosed by his outward appearance or was discoverable without a

physical examination of him which included a count or testing of his blood.

[3] Where the disease is one the existence of which at a given stage of it is not discoverable, even by a skilled physician, except by ascertaining existing symptoms and making an examination of the blood of the person in question, a finding by a physician, based on such an examination, that that person has such disease, cannot well be said to be put in issue or impeached by a finding of the absence of disease by another physician, who made no such exmination, and from whom the symptoms suggesting such examination were concealed, or by testimony, based only on observation of such person's outward appearance, that he then seemed to be in good health. Obviously such evidence lacks probative value, where the question is whether a person has or is free from a disease or ailment which is not discoverable by merely observing the outward appearance of that person. Metropolitan Life Ins. Co. v. Betz, 44 Tex. Civ. App. 557, 99 S. W. 1140.

The setting up of the testimony relied on by the plaintiff in error against the otherwise uncontroverted testimony to the effect that the deceased was not in good health when the policies were delivered may be compared with an attempt to contradict testimony as to the color of a thing given by a witness who is capable of distinguishing colors by testimony on that subject by a witness who is color blind and cannot tell one color from another. But, assuming that the evidence relied on by the plaintiff in error, if standing by itself, was sufficient to support a finding that the deceased was in good health when the policies were delivered, it was not such evidence as reasonably could be given the effect of rebutting or contradicting the evidence which showed that the deceased then had a serious internal disease, the existence of which was not disclosed by his outward appearance.

We are of opinion that the record shows that the evidence as a whole was such as required a finding that, within the meaning of the above-mentioned provision of the policies, the deceased was not in good health when they were delivered to him. That being so, it was not error for the court to direct a verdict involving that finding. Barrett v. Virginian Railway Co., 250 U. S. 473, 39 S. Ct. 540, 63 L. Ed. 1092; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680. Plainly rulings on evidence which were complained of did not involve reversible error.

The record shows no reversible error. The judgment is affirmed.